# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LISA FIKE,                          :
                                    :
          Plaintiff                 :      CIVIL NO. 3:11-CV-02288
                                    :
     vs.                            :      (Judge Conaboy)
                                    :
MICHAEL J. ASTRUE,                  :
COMMISSIONER OF SOCIAL              :
SECURITY,                           :
                                    :
          Defendant                 :

## MEMORANDUM

## BACKGROUND

          The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff Lisa Fike's claim for social security disability
insurance benefits.

          On November 1, 2007, Fike protectively filed[1] an
application for disability insurance benefits. Tr. 10, 45, 125-129
and 138.[2]  The application was initially denied by the Bureau of
Disability Determination[3] on August 4, 2008. Tr. 10 and 47-51.

_____

1.  Protective filing is a term for the first time an individual
contacts the Social Security Administration to file a claim for
benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is
actually signed.

2.  References to "Tr.___" are to pages of the administrative
record filed by the Defendant as part of his Answer on February
9, 2012.

3.  The Bureau of Disability Determination is an agency of the
state which initially evaluates applications for disability
insurance benefits on behalf of the Social Security
                                             (continued...)

On September 24, 2008, Fike requested an administrative hearing. Tr. 52. After about 10 months had passed, a hearing was held on July 13, 2010. Tr. 19-44. On July 22, 2010, the administrative law judge issued a decision denying Fike's application. Tr. 10-18. On August 17, 2010, Fike filed a request for review with the Appeals Council. Tr. 6. After approximately 15 months had passed, the Appeals Council on November 3, 2011, concluded that there was no basis upon which to grant Fike's request for review. Tr. 1-5. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Fike then filed a complaint in this court on December 9, 2011. Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on July 6, 2012, when Fike elected not to file a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Fike met the insured status requirements of the

---

3. (...continued)
Administration. Tr. 48.

4. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

Social Security Act through December 31, 2012. Tr. 10, 12 and 138.

Fike, who was born in the United States on December 16, 1969,[5] withdrew from school after completing the 8th grade but obtained a General Equivalency Diploma (GED) in 1990 and can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 22, 141, 149, 154 and 311. During her elementary and secondary schooling, Fike attended regular education classes. Tr. 149. After obtaining a GED, Fike completed training to become a truck driver and in 2006 obtained a Commercial Driver's License. Id.

Fike has past relevant employment[6] as (1) a customer service representative, (2) a nurse's aide and (3) as a truck driver.[7] Tr. 143. Documents filed with the Social Security Administration reveal that the customer service representative was

---

5. At the time of the administrative hearing and the administrative law judge's decision, Fike was 40 years of age and considered a "younger individual" whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. § 404.1563(c). The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

6. Past relevant employment in the present case means work performed by Fike during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

7. Fike only worked as a truck driver for about 4 months. Tr. 161. She worked as a customer service representative from 1996 to 2004. Id.

sedentary work; the nurse's aide as actually performed by Fike was very heavy work because the heaviest weight she lifted was 150 pounds; and the truck driver position was medium work because the heaviest weight she lifted was 50 pounds.[8] Tr. 161-166.

---

8. The terms sedentary, light, medium, heavy and very heavy work are defined in the regulations of the Social Security Administration as follows:

(a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) *Light work*. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work*. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work*. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If

(continued...)

4

Records of the Social Security Administration reveal that Fike had reported earnings in the years 1987, 1989, 1991, 1996 through 2006, and 2008. Tr. 132-133. Fike's highest annual earnings were in 2003 ($18,848.16) and her lowest in 2008 ($84.00). Id. Fike's total earnings during those fifteen years were $123,679.46 Id. Fike has no reported earnings after 2008. Id.

Fike claims that she became disabled on October 6, 2006, because of herniated discs in the neck and nerve damage. Tr. 47 and 142. Fike claims that she can not lift more than "a gallon of milk;" that her arms ache; she has pinched nerves, headaches and back pain; and that she sometimes wakes up and can not get out of bed. Id. The alleged impetus for Fike's physical problems was a motor vehicle accident which occurred on October 6, 2006. Id. Fike alleges she has cervical pain that radiates into the left arm. Tr. 52. Fike claims that she has "extreme headaches" and "extreme upper thoracic to lower back pain" which radiates into the lower extremities. Tr. 52 and 174. Fike contends that she can

---

8.  (...continued)
        someone can do heavy work, we determine that he or she
        can also do medium, light, and sedentary work.

        (e) *Very heavy work*.  Very heavy work involves lifting
        objects weighing more than 100 pounds at a time with
        frequent lifting or carrying of objects weighing 50
        pounds or more.  If someone can do very heavy work, we
        determine that he or she can also do heavy, medium,
        light and sedentary work.

20 C.F.R. § 404.1567.

only sit, stand, walk and drive for short periods of time and that she has memory loss, migraine headaches and medication side effects. Tr. 52. Fike has not engaged in work amounting to substantial gainful activity since October 6, 2006. Id.

For the reasons set forth below we will affirm the decision of the Commissioner denying Fike disability insurance benefits.

## STANDARD OF REVIEW

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by

the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. <u>Brown</u>, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S.

474, 488 (1971).  A single piece of evidence is not substantial
evidence if the Commissioner ignores countervailing evidence or
fails to resolve a conflict created by the evidence.  <u>Mason</u>, 994
F.2d at 1064.  The Commissioner must indicate which evidence was
accepted, which evidence was rejected, and the reasons for
rejecting certain evidence.  <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642
F.2d at 706-707.  Therefore, a court reviewing the decision of the
Commissioner must scrutinize the record as a whole.  <u>Smith v.
Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v.
Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must
demonstrate an "inability to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous
period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).
Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work.  For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the

8

national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating claims for disability insurance benefits.  See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[9] (2) has an impairment that is severe or a combination of impairments that is severe,[10] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[11]

---

9.  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

10.  The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

11.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless
(continued...)

(4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[12]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

---

11. (...continued)
of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

12. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

**MEDICAL RECORDS**

   Before we address the administrative law judge's decision and the arguments of counsel, we will review some of Fike's medical records.

   On October 8, 2006, Fike visited the emergency department at Binghamton General Hospital, Binghamton, New York, complaining of neck pain and left upper extremity numbness caused by an October 6, 2006, work-related injury in which the 18-wheel tractor trailer she was operating and another vehicle collided head-on. Tr. 198-200. The estimated speed of the other vehicle was 25 miles per hour. Tr. 200. Fike did not complain of weakness, headache, nausea, abdominal pain, vomiting or laceration. Tr. 198. Fike did not suffer a blow to the head, loss of consciousness or seizure and was "not dazed." Id. At the time of the accident, Fike was wearing a "lap belt and shoulder harness" and after the collision Fike was "ambulatory at the scene." Tr. 200.

   A registered nurse, Arthur Creeley, at the Binghamton General Hospital stated on October 8, 2006, with respect to Fike's functional abilities that there was "no impairments noted." Id. Mr. Creeley further indicated that Fike was "ambulatory to room," alert, in no acute distress, well nourished, oriented to person,

place and time, and her extremities exhibited normal range of motion. Id.

The results of a physical examination performed by the attending physician, Safa Naman, M.D., on October 8th were normal. Tr. 198. Fike was oriented to person, time and place; her head was non-tender with no swelling; her extraocular movements were intact; she had no decreased range of motion in the neck and it was non-tender; her abdomen was non-tender; her pelvis was stable;, her extremities were atraumatic; she had no lower extremity edema; she had no sensory deficits; and her reflexes were normal. Id. A CT scan of the cervical spine revealed no evidence of cervical spine fracture but small left paracentral C5-6 and C6-7 disc protrusions. Tr. 206. Dr. Naman when interpreting the CT scan noted that it revealed "[n]o acute findings." Tr. 198. Dr. Naman's assessment was that Fike suffered from a sprained neck. Tr. 199. Dr. Naman instructed Fike to wear a neck collar and directed that she not go to work on October 9th and 10th. Id. Dr. Naman also prescribed the nonsteroidal anti-inflammatory medication Lodine,400 mg, 1 tablet every 12 hours for 7 days, and discharged Fike from the hospital. Id.

Two days later, on October 10, 2006, Fike was examined by Walid Hammoud, M.D., at United Occupational Medicine, located in Binghamton. Tr. 239-240. This examination appears to be in

12

connection with a worker's compensation claim by Fike against her employer.[13] Tr. 238. At the appointment Fike reported neck pain that radiated down her non-dominant left upper extremity and a headache. Tr. 239. Dr. Hammoud's physical examination of Fike revealed minimal tenderness corresponding to the C5, C6, C7 levels of the cervical spine and T1 level of the thoracic spine which was exaggerated by flexing or rotating the neck. Id. The examination further revealed no sensory or motor loss, normal reflexes, no weakness, 4/5 grip strength on the left and 5/5 grip strength on the right, and possibly slight decrease in skin temperature at the left hand compared to the right hand. Id. Dr. Hammoud concluded that Fike suffered from a cervical sprain and adjusted her medications. Tr. 240. He also ordered an MRI. Id. Dr. Hammoud reviewed the CT scan and noted that "one cannot tell whether this is posttraumatic or and old one, rule out neurocompression." Id. Fike was restricted from driving a truck or performing work that involved lifting, pushing, or pulling more than 10 pounds. Tr. 238.

On October 13, 2006, Fike had an MRI of the cervical spine performed at Lourdes Hospital located in Binghamton. Tr. 215. The report of the MRI states in relevant part as follows:

---

13. The record reveals that Fike was employed by the trucking company U.S. Xpress and that Fike settled the worker's compensation claim for the amount of $102,000.00. Tr. 28 and 238.

There is reversal of the cervical lordosis at C6-7. The alignment of the cervical spine is maintained. There are no deformities of the vertebral bodies, no abnormal bone marrow replacement. The prevertebral soft tissues are normal in thickness. There is no cerebellar tonsillar ectopia. The cervical cord is intact.

C2-C3, C3-C4, C4-C5 disc levels show no central spinal canal or neural foraminal encroachment.

C5-C6 disc level show mild anterior and marginal osteophyte formation, mild right unconvertebral osteoarthritis. Right neural foramen is mildly narrowed. The central spinal canal is maintained.

C6-C7 shows moderate circumferential disc osteophyte formation, unconvertebral osteoarthrits greater on the right. There is severe right, moderate to severe left neural foraminal encroachment, mild central spinal canal stenosis.

C7-T1 level is unremarkable.

IMPRESSION:

Cervical spondylolysis most advanced at C6-C7.

Id. Oddly the MRI revealed severe right neural foraminal encroachment at the C6-C7 level but all of Fike's reported symptoms up to the date of the MRI primarily related to her non-dominant left upper extremity.[14]

On October 13, 2006, a medical provider at United Occupation Medicine completed a document entitled "Workers' Compensation Patient Management Record." Tr. 237. That document under a section entitled "Functional Work Capabilities" reveals

---

14. Fike is right-handed. Tr. 156.

that Fike was limited to lifting, pushing and pulling no more than 10 pounds and could not engage in truck driving. Id.

On October 14, 2006, Fike returned to the emergency department at Binghamton General Hospital with complaints of continued neck pain "described as being in the area of the left side of the cervical spine and cervical spine." Tr. 207-214. Fike also complained of abdominal pain, nausea and vomiting. Id. When the attending physician, Mitchell Feldman, M.D., reviewed Fike's systems[15] Fike denied fever, eye discomfort, headache, depression, sore throat, cough, difficulty breathing, chest pain, skin rash, diarrhea, black stools, difficulty with urination, urinary frequency, hematuria, vaginal discharge, irregular periods or bloody stools. Tr. 207.  The physical examination of Fike's neck revealed: "Normal inspection. Pain in the neck upon movement. Muscle spasm of the neck. Decrease in [range of motion]. Painless [range of motion]. Vertebral tenderness." Id.  Examination of Fike's abdomen revealed "[t]enderness in the epigastric area." Id. Examination of Fike's back and extremities revealed normal findings, including no tenderness and painless range of motion. Id.  Dr. Feldman stated that Fike was oriented to person, place

---

15. "The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/ clinicalmed/ros.htm (Last accessed March 8, 2013).

and time and had no motor or sensory deficits. Tr. 208.  After being given gastrointestinal medications Fike felt better and was discharged from the hospital with a prescription for Prilosec for her gastrointestinal difficulties and Skelaxin, a muscle relaxant. Id.  At discharge her condition was noted to be stable. Id.

On October 16, 2006, a medical provider at United Occupation Medicine completed a document entitled "Workers' Compensation Patient Management Record." Tr. 234.  In that document under the section entitled "Functional Work Capabilities" was written the following: "same."  It is reasonable to conclude that this notation indicates that the limitations imposed on October 13, 2006, remained in effect, that is no lifting, pushing or pulling more than 10 pounds and no truck driving.

On October 25, 2006, Fike had an appointment with Eduardo Meirelles, M.D., of Southern New York Neurosurgical Group, located in Johnson City, New York. Tr. 251-253.  Dr. Meirelles conducted a neurological evaluation of Fike. Id.  Fike in contrast to her initial report on October 8th told Dr Meirelles that she was involved in a head-on collision where the other vehicle was traveling approximately 80 miles per hour and she did not remember whether she lost consciousness. Tr. 251. Fike reported neck pain radiating down the left arm into the fingers, as well as headaches and upper thoracic discomfort. Id.  Fike did tell Dr. Meirelles

that her headaches were "getting significantly better more recently" and that she had "no nausea associated with them." Id.

A physical examination of Fike by Dr. Meirelles revealed that Fike was alert and oriented to person, time and place; she had reduced range of motion of the cervical spine because of pain; she had normal tone and strength in all muscle groups; she had normal sensation to light touch and pinprick; she had normal reflexes; and her gait and coordination were within normal limits. Tr. 252. Dr. Meirelles's assessment was that Fike had a whiplash injury and post-concussion syndrome; and he "reassured her that most patients tend to improve completely after weeks to months." Tr. 253. Dr. Meirelles prescribed a neck collar for activities and advised her to stay off work "for now" and take her current medications. Id.

Dr. Hammoud also examined Fike on October 25, 2006. Tr. 229-231. Dr. Hammoud's objective finding on examination were as follows: "The exam itself she is alert, conscious, and coherent, although she has severe headache. There is some cervical tenderness over the mid cervical area. Also pain in the soft tissue of the neck on [] both sides, more so in the left side. There is pain over the left trapezial edge. No pain by exam over the left triceps area or the forearm in the left side. But she characterizes it as pain in that area nevertheless. There is no

sensory or motor loss in her upper extremity." Tr. 230.  Dr. Hammoud noted that Fike's neurological exam was completely normal and that she could work at a light duty desk job, but not as a truck driver. Tr. 229-230.

Fike had an appointment with Dr. Meirelles on December 6, 2006. Tr. 245-248.  On December 6th Fike complained of debilitating and radiating neck pain, but denied any significant headaches. Tr. 247-248.  On January 17th Fike reported radiating neck pain and discomfort, as well as associated, frequent headaches. Tr. 245-246.  At the appointment on December 6th the objective findings were as follows: "[S]he can flex and extend the neck in a limited range of motion. Lateral flexion to the left caused discomfort.  She does not seem to have any motor or sensory deficits." Tr. 247.  At the appointment on January 17th Fike was "able to flex, extend and rotate her neck" but "extension and rotation [was] limited and range of motion characterized by significant discomfort." Tr. 245.  Dr. Meirelles noted that Fike's recent cervical MRI showed a straightening of her cervical spine and an osteochondral bar at C6-7 that cause some bilateral neural foraminal stenosis. Tr. 215 and 247. He also stated that Fike may have some level of spinal degeneration that was exacerbated by the truck accident and now caused a left C6-7 radiculopathy. Tr. 215, 245 and 247-248.  Dr. Meirelles continued to recommend

conservative treatment and saw no reason for surgery. Tr. 246 and 248.

On February 28, 2007, Matthew Bennett, M.D., another neurosurgeon, examined Fike at the Southern New York Neurosurgical Group in Johnson City. Tr. 243-244. Dr. Bennett noted that Fike reported "somewhat vague" symptoms of "neck ache, headaches and intermittent paresthesias." Tr. 243. The results or a physical examination were essentially normal, including normal motor strength and sensation. Id. Dr. Bennett's assessment was that Fike suffered from "[n]eck pain, headaches, irritability, status post MVA" and "[i]ntermittent left upper extremity pain after MVA." Tr. 244. Like Dr. Meirelles, Dr. Bennett recommended pain management and conservative treatment. Id.

On April 10, 2007, Fike visited the emergency department at Mercy Hospital in Scranton, Pennsylvania, complaining of neck pain and a headache. Tr. 254-260. Fike was given the pain medication Percocet and discharged in good condition. Tr. 255 and 257. The diagnostic impression was "cervical headache." Tr. 257. Fike told a medical provider at the emergency department that she did not like her New York physicians. Tr. 256.

On May 31, 2007, Fike was examined for the first time by Pamela J. Costello, M.D., a neurosurgeon, in Scranton, with follow-up appointments on July 5 and November 27, 2007. Tr. 261-

19

272.  Dr. Costello instructed Fike not to return to her job (the truck driver position) and to engage in only moderate and non-strenuous activities. Tr. 263, 267 and 271.  She also recommended surgery after Fike had quit smoking. Id.  Fike did not quit smoking until two weeks before her November 27th appointment.[16] Tr. 261.

On January 9, 2008, Dr. Costello performed a C5-6, C6-7 anterior cervical discectomy with fusion and plate. Tr. 261 and 350.  The surgery went well, without any neurological incident. Tr. 350.  Subsequent imaging studies of the cervical spine in 2008 and 2009 showed postoperative changes, a stable fusion, mild neuroforaminal narrowing, and no disc herniations or cord compromise. Tr. 326, 352 and 358.

---

16.  Fike had a history of smoking 1 pack per day for 22 years. Tr. 270. At the administrative hearing held in this case on July 13, 2010, Fike testified that she was smoking six cigarettes per day. Tr. 29.  Dr. Costello repeatedly explained to Fike the "[a]dverse effects of tobacco on the spine" including "the need to fully be smoke free and free of passive smoke exposure." Tr. 271.  "Smoking . . . adversely affects [the] discs and can cause them to degenerate faster.  Smoking actually decreases the amount of water in [the] discs, and water is part of what helps [the] discs absorb movement.  With less water content [the] intervertebral discs can wear out sooner." Causes of Degenerative Disc Disease, SpineUniverse, http://www.spineuniverse.com/ conditions/degenerative-disc/causes-degenerative-disc-disease (Last accessed March 8, 2013).

The record reveals that Fike continued to complain of pain in the left arm and elbow and occasional paresthesia in the left hand as well as intermittent headaches. Tr. 273.

On June 16, 2008, Fike was examined by Shashank Bhatt, M.D., on behalf of the Bureau of Disability Determination. Tr. 280-284. On physical examination, Fike was alert, oriented, in no acute distress, and had a normal mood and affect. Tr. 282. She had normal muscle bulk and tone; no muscle atrophy; normal reflexes in the knees, ankles and right upper extremity and diminished reflexes in the left upper extremity; she had 4/5 grip strength on the left and 5/5 grip strength on the right; and she had normal sensation throughout, except for a slight diminution in the left upper extremity. Tr. 282-283. Fike was able to get on and off the examination table without difficulty; squat and rise with slight difficulty; and walk adequately on her heels and toes. Id. Fike only reported occasional headaches. Tr. 281.

On July 28, 2008, Louis Bonita, M.D., a state agency medical consultant reviewed the evidence in the record and concluded that Fike retained the physical residual functional capacity to perform a range of light work with certain postural limitations. Tr. 285-291.

On August 18, September 9 and October 16, 2008, Dr. Costello performed post-surgical follow-up evaluations of Fike,

who complained of neck, thoracic, lumbar, and left upper extremity pain and headaches. Tr. 327-31 and 350-357. The results of Fike's physical examinations on each of those dates were largely the same. Fike was alert and oriented with fluent speech and full sensorium, and she reported tenderness on palpation of the spine; Fike was able to walk on her heels and toes; she had moderately restricted cervical range of motion; she had decreased sensation in the left upper extremity; she had slightly decreased motor strength in the upper extremities; she had a negative Hoffman's sign; and she had a normal gait. Id.

An MRI of the cervical spine dated August 29, 2008, revealed "no significant change since 3/12/08. Moderate right and mild left foraminal narrowing at C6/7 [] related to unconvertebral hypertrophy. No evidence of disc herniation." Tr. 352. An MRI of the cervical spine dated February 7, 2009, revealed "[n]o significant change from the prior study, right greater than left C7 neuroforaminal narrowing due to unconvertebral hypertrophy. No acute disc herniation nor canal compromise." Tr. 326.

On February 24, 2009, Dr. Costello terminated the doctor-patient relationship with Fike because of Fike's aggressive and threatening behavior toward her, her staff, and patients. Tr. 324.

On August 13, 2009, David W. Gaw, M.D., after reviewing Fike's medical records, authored a letter in which he stated that

Fike was able to perform work that did not involve repetitive, awkward positioning of her neck or repetitive, outstretched or overhead lifting of more than 5 pounds. Tr. 323-333. It does not appear that Dr. Gaw ever examined Fike.

Fike returned to the Southern New York Neurological Group for care in the summer of 2009, and was seen by Khalid Sethi, M.D., or other staff members on August 13, October 21, November 19, 2009, and February 17, 2010. Tr. 340-345. Fike reported significant neck and back discomfort during those office visits. Id. Treatment notes reflect no evidence of myelopathy, cauda equina, or conus symptomatology; some weakness in the left biceps and triceps, but otherwise good strength; no new focal myotomal weakness; limited range of motion in the cervical spine and lumbar spine; and no neurological deficits in the upper or lower extremities. Tr. 340-341 and 343-344.

On March 2, 2010, Elizabeth Karazim-Horchos, D.O., performed a consultative examination of Fike on behalf of the Bureau of Disability Determination. Tr. 299-313. Fike told Dr. Karazim-Horchos that she had radiating neck and low back pain, a "neck headache," and numbness and tingling in the arms and hands. Tr. 301-302 and 310-313. Examination revealed full motor strength in all extremities; a slightly blunted triceps reflex; somewhat reduced sensation in the C6-7 dermatone, left greater than right; a nonantalgic gait; and ability to heel and toe walk; no upper

extremity atrophy; a negative Spurling's test; functional balancing capability; somewhat reduced cervical range of motion with hesitancy; slightly decreased range of motion in the lumbar spine and shoulder; and normal range of motion in the elbows, wrists, knees, hips and ankles. Tr. 301-302 and 310-313. Dr. Karazim-Horchos completed a medical source statement of Fike's work-related functional abilities in which she opined that Fike could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; could stand and walk 2 to 4 hours and sit without limitation in an 8-hour workday; could occasionally perform postural activities; and had no environmental restrictions or limitations in reaching, handling, fingering, feeling, or other physical functions. Tr. 299-300.  Dr. Karazim-Horchos's assessment permits Fike to engage in sedentary work.

On March 30, 2010, a lumbar MRI revealed a small disc herniation at L4-5, which did not compress the L4 nerve root but restricted the space for the proximal left L5 nerve root, and a small upwardly migrated disc fragment that did not compress the adjacent L5 nerve root. Tr. 346.

On April 15, 2010, Fike had a final appointment at Southern New York Neurosurgical Group with Dr. Sethi. Tr. 348.  On examination, Fike had reasonable motor strength; no focal myotomal weakness; and no evidence of any myelopathy or active radiculopathy. Id.  It was noted that Fike's gait was stable.  Dr.

24

Sethi further noted that "there is no role for surgical intervention here" and in response to "[h]er biggest question in regarding disability" recommended a functional capacity evaluation. Id. Dr. Sethi informed Fike to follow-up with him on an as needed or yearly basis. Id.

**DISCUSSION**

The administrative law judge at step one of the sequential evaluation process found that Fike had not engaged in substantial gainful work activity since October 6, 2006, the alleged disability onset date. Tr. 12.

At step two of the sequential evaluation process, the administrative law judge found that Fike had the following severe impairments: "cervical impairment and degenerative disc disease of the lumbar spine[.]" Id. Throughout the ALJ's decision he also addressed Fike's complaints of headaches and left upper extremity weakness and other symptoms. Tr. 13-17.

At step three of the sequential evaluation process the administrative law judge found that Fike's impairments did not individually or in combination meet or equal a listed impairment. Tr. 12.

At step four of the sequential evaluation process the administrative law judge found that Fike "retained the residual function capacity to perform sedentary work, which entails sitting

six hours, standing/walking two hours and lifting/carrying ten pounds in an eight-hour workday with sitting and standing alternat[ing] at will." Tr. 17. In setting this residual functional capacity, the administrative law judge found that Fike's medically determinable impairments could reasonably be expected to cause her alleged symptoms but that her statements concerning the intensity, persistence and limiting effects of those symptoms were not credible to the extent they were inconsistent with the ability to perform sedentary work. Tr. 13. The administrative law judge also relied on the opinion of Dr. Karazim-Horchos who found that Fike could perform sedentary work. Tr. 17.

Based on the above residual functional capacity the ALJ found that Fike could perform her prior relevant sedentary work as a customer service representative. Tr. 18. Consequently, the ALJ found that Fike was not disabled and did not proceed to step five of the sequential evaluation process.

The administrative record in this case is 372 pages in length and we have thoroughly reviewed that record. The administrative law judge did an adequate job of reviewing Fike's vocational history and medical records in his decision. Tr. 10-18. Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 21, Brief of Defendant.

Fike argues that the administrative law judge erred in failing to consider (1) her headaches and depression, (2) the combined effects of her conditions, including migraine headaches and depression, and (3)the medical opinions and evidence of record in determining her residual functional capacity.  Fike further argues that the ALJ failed to properly assess her credibility.  We find no merit in Fike's arguments.

The Social Security regulations require that an applicant for disability insurance benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled."  20 C.F.R. § 404.1512(c).  No treating or examining physician has indicated that Fike suffers from physical or mental functional limitations that would preclude her from engaging in the limited range of sedentary work set by the administrative law judge in his decision for the requisite statutory 12 month period.[17]  No physician indicated that Fike was

---

17.  To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

incapable of working at that modest level on a full-time basis. Moreover, we can not conclude based on a review of the bare medical records that Fike is unable to engage in the limited range of work set by the administrative law judge (in fact it is not our scope of review to do so in so far as we are limited to a substantial evidence review).

The administrative law judge relied on the opinion of Dr. Karazim-Horchos, a state agency physician who examined Fike. The administrative law judge's reliance on that opinions was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

We are satisfied that the administrative law judge appropriately took into account all of Fike's credibly established limitations in the residual functional capacity assessment. With respect to Fike's headaches, the ALJ repeatedly referenced Fike's complaints of headaches in her decision, and a review of the decision shows that she considered and evaluated those headaches in conjunction with Fike's cervical spine impairment, which the ALJ did find to be a "severe" impairment. With regard to Fike's claim that the ALJ did not consider her depression, the record fails to

establish that she suffered from a severe mental impairment. In fact when Fike filed her claim she never asserted such an impairment. There is no evidence that Fike was ever treated by a psychologist, psychiatrist or other mental health profession for depression. Also, no treating physician has stated that she has a mental impairment which would prevent her from engaging in full-time sedentary employment for the requisite continuous 12 month period.

The administrative law judge stated that Fike's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the ability to perform a limited range of sedentary work.[18] The administrative law judge was not required to accept Fike's claims regarding her physical and mental limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with

_____

18. It is a limited range because the ALJ included a sit/stand option at will. The full-range of sedentary work would not include such an option.

29

the duty of observing a witness's demeanor . . . ."  Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility.").  Because the administrative law judge observed and heard Fike testify, the administrative law judge is the one best suited to assess the credibility of Fike.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.


                    S/Richard P. Conaboy
                    RICHARD P. CONABOY
                    United States District Judge

Dated: March 12 , 2013